Campbell, Chief Justice,
dissenting:
As suggested in the majority opinion, all of the members of the court did not agree upon the findings of fact. The discussion of some objections to the findings will appear without a detailed reference to them, but the last paragraph *188 of Finding X was dissented from because it is manifestly a conclusion and its pertinency to the issues in this case is denied, notwithstanding the explanation in the opinion that “the paragraph is limited exclusively to a fact which goes alone to the question of the right to cease work after the break—the right to abandon the contract—and is of paramount importance in this respect.” Whether the recovery, authorized by the court, rests upon “the right to abandon the contract” or the supposed warranty by the defendants of the plans and specification, must be determined from the opinion itself, but because I dissent from the reasoning and conclusions of the court as well as from some of the findings, it becomes necessary to state more at length my views of the entire case.
The material facts necessary to a full understanding of the questions involved are simple, and practically undisputed.
Advertisement having been made for proposals “ for the construction by contract of a dry dock of the general dimensions, and to be located at said navy yard at the place shown by the plans and specifications therein referred to,” the plaintiff, as the successful bidder, entered into a contract to construct and complete said dry dock according to the plans and specifications attached to the contract and with modifications as contemplated by paragraph 268. A copy of the contract is attached to the petition.
The site of the proposed dry dock having been selected at a place in the navy yard which had upon it buildings and structures, pipes and tracks, and, among other things, what is described in paragraph 196 of the specification as “the intercepting sewer in Dock Street which now crosses the dock site,” the plans and specifications provided for the removal of said structures and the diversion of the said sewer, which will hereafter be called the 6-foot sewer, “ around the head of the dry dock, as shown on sheet 3.” The evident purpose in this removal of structures and diversion of the 6-foot sewer was to clear the dry-dock site of impediments to the construction at said place of the dry dock. It will be noted here that paragraph 196, referring to the 6-foot sewer, is under the general heading in the plans of “ Tem *189 porary works and preparation of site.” It was accordingly provided that the contractor should divert the sewer, and map 3 showed the location of the diverted section of it. There was no change to be made in its size or construction, brick being used in the latter as they were in the balance of the sewer. “ The construction of the intercepting sewer and the removal of those structures to be torn down ” were to be completed within six months from the date of the contract, and the entire work was required to be completed within 42 months from the date of the contract.
The said structures were removed, the 6-foot sewer was diverted in accordance with said map 3 within the stipulated time, and the sewer work was accepted and paid for by the defendants. The plaintiff then proceeded with the work of constructing the dry dock. On the 7th day of August, 1907, a year after the said diversion of the 6-foot sewer, “ a sudden and heavy downpour of rain occurred, and coincident with it was a high tide, which forced water a considerable distance up the sewer to a depth of 2 feet or more,” and the 6-foot sewer cracked in the part of it which had been diverted, and through the cracks water flowed into the dry-dock prism. Finding IX states that said break was caused by internal pressure of water from the sudden and heavy downpour of rain in conjunction with said existing high tide, which the sewer was not of sufficient size to carry away. This 7-foot sewer was intercepted by the 6-foot sewer a short distance from the dry-dock site, and both of them were parts of and main outlets to the Brooklyn sewer system. Some years prior to said contract a dam or obstruction 5 feet high had been placed in the 7-foot sewer, which diminished its capacity and increased the burden on the 6-foot sewer. The existence of said dam was not known to any of the parties concerned with said contract or plans nor to the superintendent of sewers of the city of Brooklyn. Said sewers had overflowed in the past “ at sundry times as the result of sudden and heavy downpours of rain” and flooded portions of the navy yard and contiguous portions of said city. These conditions of overflow were matters of common knowledge in the said neighborhood and were *190 known to defendants’ officer in charge, as well as to said superintendent of sewers.
Though bidders were admonished by the plans and specifications, sections 271 and 274 above, to visit the site and inform themselves thoroughly of the actual conditions and requirements before submitting proposals, and that application should be made to the chief of the bureau or commandant at said navy yard for any further information needed by bidders, the plaintiff did not call upon either of said officers, but as shown by Finding VII, he visited the site of the proposed work and made a superficial examination thereof. The finding also states that he sent one or two representatives to the civil engineer’s office at the navy yard to obtain what information they could concerning the conditions and probable cost of the work. Whether these representatives actually called upon said officer or made any inquiries “concerning the conditions” is left to inference. There is no proof that they did so. It is entirely clear that the plaintiff personally did not see any of the said officers or seek information relative to the conditions, present or past, surrounding the sewers, because when questioned while he was testifying he not only answered, “ I believe I did make a superficial examination of the site. The site was pretty well covered with buildings and very little could have been determined by an examination of the site,” but also that he knew there was a seven-foot sewer running down on the east side of the dock and a transverse six-foot sewer crossing it near the head of the dock, that he had no information as to their overflows, and that he did not make any inquiries to find out what were the capacity and results of these sewers, because, he says, “ that would have been checking up the engineering of the work, and I assume that the engineering of the work had been properly done.” The plaintiff thus ignored the reasonable requirement of paragraph 274 of the plans to seek information before making his bid, as well as the provisions of paragraph 25, requiring the contractor to “check all plans furnished him.” In view of these facts and of the language of Finding VI that plaintiff was not informed by the officer in charge that the sewers *191 had overflowed and that some other bidders were so informed, it is manifest that the just inference from the facts is that some bidders got information which the plaintiff did not get because they sought it and gave opportunity to the officer in charge to communicate it, while the plaintiff neither sought it nor gave such opportunity to the officer. “ On the 7th day of August, 1906, a sudden and heavy downpour of rain occurred and coincident with it was a high tide, which forced water a considerable distance up the sewer to a depth of 2 feet or more; and during that period the sewers in the vicinity of the navy yard overflowed, and the said 6-foot sewer broke in the part constructed by the claimant, causing longitudinal cracks in three places in its top for a total length of 35 feet at a point opposite the head of the dry dock and about 50 feet therefrom, through which cracks water flowed into the excavation for the dry dock.”
When the said break in the sewer occurred the plaintiff had been working on the dry-dock prism for a year without any interference from the sewer.
Immediately after said break the plaintiff addressed a communication to the officer in charge relative to the same, “stating his purpose to suspend operations and not to resume until the Government had made provision for caring for or assuming the responsibility for the damage that had been or might be occasioned by the said sewer, its insufficient capacity, and location” (Finding X). This was on August 10, 1906, and the annullment of the contract did not occur until November, 1907, some 15 months later. In the meantime work under the contract was suspended. It appears that each party acted upon legal advice. On January 14, 1907, and again on January 25, the Secretary of the Navy addressed to plaintiff the communications mentioned in Finding X. In the first of these letters the Secretary, inclosing a copy of the opinion, said:
“ In view of the Attorney General’s opinion the department holds you responsible for the completion of the work required by your contract, and it is accordingly requested that you proceed without further delay with the fulfillment of your operations in the premises. If you conclude, as your attorney said you probably would, not to proceed with the *192 work, it is requested that you notify the department immediately to that effect.”
Under date of January 29, 1907, the plaintiff replied, and, besides stating his unwillingness to resume work, said:
“ You must recognize that the main point at issue is not as to who is responsible for what has occurred, but what is to be done for the future. Unquestionably a grave blunder has been made in the design of this sewer, and again in locating it where it is around the head of this dry-dock structure within the line of the natural slope of the excavation. Such conditions render it impossible for me to comply with your demand that I proceed with the work without modification of the sewer plan.”
The matter did not stop here, but thereafter a board of investigation was appointed, as stated in Finding X. This board convened on March 30 and “heard many witnesses, including those called by the claimant, who appeared before the board and was represented by counsel during its investigation. The board made its report, to which the contractor filed a number of exceptions” (Finding X). The board’s report reviewed the whole matter relative to the sewer and a drainpipe complained of and set forth their conclusions, to which exceptions were filed by the plaintiff and considered. On June 13, 1907, the Secretary again requested plaintiff to resume operations under the contract without further delay. More correspondence ensued, and on November 14 the contract was annulled under the provisions of the contract. The plaintiff did not demand the repair of the sewer. He did not predicate his refusal to resume work upon “ its then condition,” but he demanded a change in its “ design and location,” an assumption by the Government of all responsibility for the damages that had been or might be “ occasioned by the said sewer, its insufficient capacity, and location.” In short, he demanded a new contract. At no time was the issue between the parties reduced to the question of which of them should repair the sewer. The real issue presented by the plaintiff was as has been stated, and while said Finding X may show it, the fact may be emphasized by the admission of plaintiff when testifying in his own interest before said board, “ I believe to-day that the menace *193 from that sewer is not from internal pressure; I believe that the sewer can he repaired or the internal pressure removed, and in either case that the sewer itself is all right, but I am convinced in my own mind that the foundation has been damaged,” as wrell as by the said statement in his letter of January 29. An estimate made at the instance of said board (Finding X) showed that to restore the sewer in as good condition as it was when completed and accepted would cost $3,875, and it is not conceivable that the expenditure of this or a greater sum would have deterred the plaintiff or the defendants if this had been the difference between them.
Considering the magnitude of his claims put in jeopardy, the profits he stood to lose, and the damages he now claims to have suffered, the cause of his failure to resume work can not be found in the fact of the break or the alleged internal pressure of the sewer or the failure of the Government to repair it. He had made a contract to construct the dry dock for a stipulated sum, with the sewer as constructed in the position it was. True, he was to divert said section of it, and did so satisfactorily, but when he bid upon said work, and preliminary to his bid examined the plans and specification, he knew exactly where the diverted section of the sewer was to be located, its size, its construction of brick; that it was merely a segment of the sewer which drained a considerable area and was one of the outlets of the sewerage system of Brooklyn. As a bidder he must be presumed to have understood the plans, Clark v. Pope, 70 Ill., 128, and he could visualize, so to speak, the sewer in its new location. The case is not different from what it would be if the sewer had been diverted by some other contractor or had originally, before the contract was made, been located at that place. And so plain is this proposition that counsel for plaintiff argued and state on their brief in this court that the claimant assumed the risk of said location of said sewer. Such being the case, he manifestly can not complain of “the Joss ascribable wholly to inherent defects in engineering, inefficient plans and designs.” These, if they existed, should have been considered before he made his contract, and they afford him no cause of action based upon an abandonment of his con *194 tract. The plaintiff’s cessation of all work under the contract and his refusal during 15 months thereafter to resume work can not he predicated upon the theory that defendants would not repair the broken sewer, but should be ascribed either to his realization that he had not protected himself, as he later thought he should have done, in his contract, or that his bid had been too low. The latter seems to me not improbable, because the consideration of his contract was $757,800, which included the expense of diverting the sewer and removing buildings from the proposed site. He had consumed 18 months out of the 42 months stipulated as the time for completion, one year of this being used in excavation alone. The findings are silent as to the amount of work actually done when plaintiff suspended operations, but I think the record shows that he had not done one-fourth of the work required. The plaintiff’s bookkeeper, testifying from his books of original entry, stated that there had been expended by plaintiff on account of the contract for said dry dock, exclusive of interest, the sum of $274,597.88. The plaintiff in his requests for findings asks the court to find the sum expended to be $274,597.88, exclusive of interest. The expenditure shows that with less than 25 per cent of the work done the plaintiff had expended nearly 85 per cent of his contract price. But when the work was relet under the same contract the lowest bidder’s proposal was to complete the work for $764,000, “under practically the same conditions, in so far as sewers were concerned, as prevailed at the time of the cancellation of claimant’s contract; ” and in addition to said sum the new contractor was to have the use of plaintiff’s plant and materials, amounting in value, as shown by Finding XII, to $97,308.73, allowing nothing for the item of sheet piling. If the new contractor had not the use of these materials and plant, his bid would have been correspondingly increased. As it was, the new contractor was, in effect, to receive the sum of said two items, making $861,308.73 to complete work upon which one year’s time had been consumed and over $220,000 had been expended by plaintiff, with at least three-fourths of the work remaining to be done. On this basis the later contractor would origi *195 nally have bid approximately $1,000,000 to do work which the plaintiff undertook to do for $757,800, or nearly $250,000 less. The finding is silent as to whether any officer connected with or making said plans and specification or contract had any knowledge or information relative to said overflows. Any knowledge imputable to them because of the general notoriety in the vicinity of the navy yard as to the fact of overflows of the sewers would be equally chargeable by the same fact to plaintiff. And it may be here said that said overflows had occurred at rare intervals. So far as the record discloses none of them had occurred during the 18 months in which plaintiff was at work, and hence the statement of plaintiff’s counsel on his brief: “ Therefore it could not have been a matter of common knowledge that they had a habit of frequently overflowing, as it was not the fact.” The findings show that none of the parties knew of the dam in the 7-foot sewer. The rule which charges the principal with the knowledge or notice his agent may have is not alike applicable to public and private agents. Hawkins v. United States, 96 U. S., 689, 691. Judge Lurton, in a case involving fraudulent representations by an agent, declared the rule to be that notice of facts to an agent is constructive notice to his principal only when it comes to the agent while concerned for the principal and in the course of the very transaction, or so near before it that the agent must be presumed to recollect it. Alger v. Keith, 105 Fed., 105, 117.
Where, then, is there any basis for a recovery by plaintiff of damages, including profits, as upon a prevention by defendants of performance? He abandoned his work and refused to proceed. His right to abandon the contract needs a more substantial basis than the refusal of the defendants to accede to his demand. He examined and studied the plans and specifications; he knew the location of the diverted section of the sewer; he had means of knowledge, which is often equivalent to knowledge itself, of the occasional overfipws of said sewers. Information, if called for, could have been had from the officer in charge or from the city engineer or anyone living in the vicinity. He made a bid to do the work, and upon its acceptance entered into a contract to *196 build and complete a dry dock. The majority opinion declares that “ no loss followed the mere location of the sewer; it was properly constructed and supported; the record finds the loss ascribable wholly to inherent defects in engineering, inefficient plans and design, a fact wholly corroborated by the subsequent contract of the defendants in caring for this same sewer,” and cites a number of cases, which will be considered later. The question of location, construction, and support being thus removed, the opinion holds that “the defendants by their plans and specifications warranted their efficiency ” and that “ the contractor had a right to rely upon them as correct representations of good and sufficient engineering skill and ability without an independent investigation of previous local conditions which might have warned him otherwise.” This view is open to serious question because of sections 271 and 274 of the specifications requiring the plaintiff to investigate and seek information as well as because of the general rule of law affecting contractors. Clark v. Pope, 70 Ill., 128, 133; Simpson's ease, 172 U. S., 372. The court holds that the defendants are liable in this case upon an implied warranty, the “inherent defects in engineering, inefficient plans and design ” constituting the breach. These defects antedated the contract, and the general rule is that all prior negotiations and agreements are merged in the written contract. “We look in vain for any statement or agreement, or even intimation, that any warranty, express or implied, in favor of the contractor was entered into ” (Simpson’s case, 172 U. S., 380) in that case concerning the character of the underlying soil or in this case concerning the design or plans. “And when the writing itself upon its face is couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the engagement it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking were reduced to writing.” Seitz v. Brewers’ Co., 141 U. S., 510, 517. An implied warranty can not be raised up where there is an express contract. Simpson’s case, 172 U. S., 372, 379, where it is said: “ Considering the facts above stated, it is at once *197 apparent that the claim against the United States can only be allowed upon the theory that it is sustained by the written contract, since if it be not thereby sanctioned it is devoid of legal foundation. The rule by which parties to a written contract are bound by its terms, and which holds that they can not be heard to vary by parol its express and unambiguous stipulations, or impair the obligations which the contract engenders, by reference to the negotiations which preceded the making of the contract, or by urging that the pecuniary result which the contract has produced has not come up to the expectations of one or both of the parties, is too elementary to require anything but statement.” See also Brawley v. United States, 96 U. S., 168, 173.
The rule thus announced is peculiarly applicable to certain Government contracts which by statute (sec. 3744,11. S.) are required to be in writing. That statute is mandatory in its requirements, and its policy excludes the idea that an implied warranty not within the implications of the language used in the express contract can be charged against the Government in the Navy Department’s engagements. Sanger’s case, 40 C. Cls., 47; South Boston Iron Co. case, 118 U. S., 37; St. Louis Hay & Grain Co. case, 191 U. S., 159; Monroe case, 184 U. S., 524.
In Sanger’s case, 40 C. Cls., 47, 69, the court considered a contract in which some changes in the plans had been made prior to its execution, and considered also section 3744, Devised Statutes, relative to the necessity for certain contracts to be in writing; and, speaking through Judge Peelle, said: “Hence the liability of the United States must be determined, not by the preliminary negotiations between the parties, but by the written contract into which the preliminary negotiations, including the change in the plans and the reduction of the quantity of stone, were merged,” citing Simpson’s case, supra; Brawley’s case, 96 U. S., 168, 173, and other cases.
But what are the inherent defects in the plans or designs? A properly located, constructed, and supported sewer is not bad engineering, and the bursting of a sewer under unusual conditions would not support the contention that it was de *198 fectively designed. The findings show that the sewer broke from internal pressure superinduced by a heavy downpour of rain and a rising tide. It hence follows that the warranty is made to extend to the strength or size of the sewer, the plans and design being regarded as faulty in that they did not “ provide for an adequate sewer ”—one large enough or strong enough to have resisted the forces which caused it to crack. But there was no such warranty stated in the contract ; and if there was a duty resting upon the defendants to have planned otherwise than they did, it could not be enforced in an action ex contractu and, therefore, could not be enforceable in this court at all. If the 5-foot dam in the 7-foot sewer “ be a factor to which we might well ascribe the cause for the whole disaster” and was unknown to any of the parties, its presence would not constitute a cause of action.
The cases cited by the court do not, it seems to me, sustain the conclusion reached in the court’s opinion. They will be referred to in their order: The Sickles case, 1 C. Cls., 214, is cited, and the rule of damages applied there has not been applied here. The assurance given in that case to the contractor that “ the bottom of the knoll consisted of hard sand ” when it developed to be soft mud, and the limited responsibility imposed by the terms of his contract, relieved the contractor in that case from performing an undertaking which both parties practically abandoned because it was found to be a “physical impossibility.” He was allowed to receive the value of his materials assembled and used for the purposes of the undertaking, but no profits were allowed.
Bentley v. State, 73 Wis., 416, is said to be a case strikingly like this, but a radical difference exists between the two cases in that Bentley fully performed his contract and Spearin positively refused to perform at all. The one relied upon an executed contract; the other sues upon an executory contract. In the Bentley case the contractor, working under direction of the State’s architect and conforming to the plans provided by the architect, built a wall which fell. Then, proceeding under a new architect and new plans, he replaced ,the fallen wall and completed the entire structure. He sued *199 afterwards for the loss incident to the falling of the wall. The case went to the Supreme Court of Wisconsin upon the ruling on a demurrer to the complaint, and its allegations were, of course, taken as true. “According to the allegations of the complaint, it (the fall) was in consequence of insufficient and defective plans and specifications for a building of that magnitude.” The plaintiff here built the diverted section of the sewer according to plans furnished him, and if, when the cracks appeared, he had repaired it and were here claiming the expense of the repairs, some similarity to the Bentley case might appear. True, the Bentley case seems to hold that the State guaranteed the plans, but that holding was not at all necessary to the conclusion reached, because under the averments of the complaint the contractor had to comply with the plans and the architect’s directions as well, and as he did both it was declared by the court that “ what was thus done or omitted to be done by the architect must be deemed to have been done or omitted by the State.” It can not be affirmed that if when the wall fell Bentley had abandoned the work that court would have authorized a recovery upon his unexecuted contract, but it can be said that the views expressed as to the relative positions of the architect and plaintiff as “ an ordinary mechanic ” are not in harmony with other decisions, notably with Clark v. Pope, 70 Ill., 128, cited in the Bentley case, wherein the Illinois court says (p. 133) :
“ The fact that he contracted to construct a building after certain plans, drawings, and specifications implies that he does understand them. The undertaking itself is upon the condition that he has that skill that will enable him to comprehend them, and the law will not permit him to escape liability on the ground he has exercised ordinary care and skill in that regard.”
The other cases cited—MacKnight Flintic Stone Co. v. Mayor, 160 N. Y., 72; Horgan v. Mayor, Ib., 516; McRitchie v. City, 30 Ill. App., 393; and Filbert v. City, 181 Pa. St., 530—are likewise inapplicable. The New York case is declared in the opinion therein to be “ a similar case ” to the Filbert case, 181 Pa. St., and in the latter it is made quite plain that the case turned upon the construction of the con *200 tract and its performance by Filbert. No question was raised or decided as to the city’s guaranty or warranty of the efficacy of its plans, except the implied holding that the contractor did not warrant the plans furnished him, and if he conformed to them he was not liable for defects in the structure after its completion. It is one thing to say that a contractor does not guarantee the stability of work done according to the plans and specifications by which he must work, and an entirely different thing to say that the owner impliedly warrants such plans. The real question in each of said cases was whether the contractor had performed his contract according to the court’s construction of it, and he was found to have done so. In none of them was a recovery predicated upon alleged defects in the plans. While there are expressions in the New York case relative to the guaranty of the efficiency of plans by the owner, they are evidently used arguendo, because in a later case, where the proposition was argued that the State “was the guarantor of its own plans” the court declined to so decide. Kinser Construction Co. v. State, 204 N. Y., 381, 396.
If the principle of guaranty or implied warranty of plans is applicable in any case, a court must hesitate to apply it in a case where the right of modification of the plans is reserved in the contract, as it is in the instant case. Kinser Cons. Co. v. State, 204 N. Y., 381; Kingsley v. City, 78 N. Y., 200, 211. Eeliance is placed in the opinion on the case of Moore, Receiver, 46 C. Cls., 139.
In connection with the rule stated in the Moore case when it is sought to extend it beyond the question decided, the language of the Supreme Court in Atlantic, Gulf & Pacific Co. v. Philippine Islands, 219 U. S., 17, 23, should be noted:
“It is suggested that the reason for the Government undertaking was that the plan was made by the Government engineers. It may have been. But the plaintiff was content to work upon that plan; it, not the Government, was doing the work, and it took the risk so far as the contract did not make a change. The Government could not be charged by it with negligence or with causing the first break. That was only something for repairing which the Government had promised to pay. Whatever the Government had not promised to pay for the contractor had to do in order to offer the completed work which it had agreed to furnish.”
*201 It would have been useless, apparently, to have enlarged the short diverted section unless all that portion of the sewer below such section and to its point of discharge hundreds of feet away was also enlarged. The defendants were dealing with a sewer that drained a large area of said city and formed a part of the city’s sewer system, and it is to be presumed that the diversion of it was done under proper authority. No such conditions had previously presented themselves, but the sewers had overflowed and remained intact. The warranty, then, is made to extend to the requirement that the diverted section would not break, because, if it does break, the contractor, upon the theory suggested, could abandon his contract and recover losses and profits as though prevented from completing his contract by the act of the defendants. It seems to me that such a conclusion goes back of the contract itself, considers what is termed inherent defects in engineering plans and designs, determines that the “ defendants by their plans and specifications warranted their efficiency,” and inferentially that they warranted that said sewer would not break. Plaintiff’s action in such case must be founded upon a breach of this implied warranty and not upon the terms of the contract, which not only is silent as to any such warranty but excludes in the most comprehensive language any idea of the assumption of the responsibility here placed upon the defendants. That the supposed implied warranty—a collateral undertaking—can not be thus imported into the contract is clear. Seitz v. Brewing Co., 141 U. S., 510. To sustain the doctrine announced Anvil Mining Co. v. Humble, 158 U. S., 540, is cited, which states the familiar rule that a party, engaging to do work, has a right to proceed free from any let or hindrance of the other party, and where such other party does prevent performance the first may treat the contract as broken. The facts showed a serious interference with the prevention of plaintiff’s operations after the contract was made and the said rule was applied. The court did not go outside of the contract obligations, but enforced them. In the instant case the plaintiff committed a breach of the contract by suspending work and refusing to proceed, and a supposed dereliction of the engi *202 neers committed before the contract was made is put in the same category as the affirmative act of defendants preventing the performance of the contract was placed in the Humble case. Hoe v. Sanborn, 21 N. Y., 552, is also cited.' It involved questions relating to sales of manufactured products and of warranties implied in sales. Certain rules applicable to sales and the right of purchasers are stated and need not be discussed because not applicable here. It may be suggested, however, that Hoe v. Sanborn points out that “ implied warranties do not rest upon any supposed agreement in fact. They are obligations which the law raises upon principles foreign to the actual contract, principles which are strictly analogous to those upon which vendors are held liable for fraud. It is for the sake of convenience merely that this obligation is permitted to be enforced under the form of contract.” Such an action, as for a deceit, sounds in tort and is not within the jurisdiction of this court. Harley's case, 198 U. S., 229. The doctrine of Hoe v. Sanborn, as to actions upon the warranty, finds its application in matters of sales. It is not extended even to an exchange of chattels. Vail v. Strong, 10 Vt., 457. The views of the Supreme Court as to implied warranties in sales where there is a written contract are stated in Seitz v. Brewing Co., supra.
The cases cited do not sustain the conclusion that the defendants made an implied warranty. They are responsible, as other parties, for the reasonable implications of the language of their contract. Under the contract in question no warranty can be implied. Simpson’s case, 172 U. S., 372; Seitz v. Brewing Co., 141 U. S., 510.
The objection to Finding XIII is not confined to its irrelevancy, but to the application made of it as well. The record shows that after the annulment of plaintiff’s contract and the reletting of it “under practically the same conditions in so far as sewers were concerned,” to the Williams Co., that company proceeded with the work. This contract was annulled October 1, 1909, nearly two years after plaintiff’s contract was annulled. The work was relet November 12, 1909, to Holbrook, Cabot & Rollins Co., whose bid on the basis of the dry dock as changed under the Williams con *203 tract was $1,389,000. The Holbrook Company surrounded the site with a cut-off wall of concrete sunk in pneumatic caissons and excavated inside of the wall. The plaintiff had steel sheet piles and the Williams Co. timber piles. It is agreed that the record does not show the impossibility of performance by plaintiff, “ nor does the court undertake to say that the plaintiff could not have repaired the sewer and proceeded with his contract.” But it is added that there was produced “ a condition that made the execution of the contract impossible without the loss of all profits”; or “impossible unless the contractor would willingly assume immeasureable responsibilities for damages.” There being no impossibility of performance, how does the question of expense tend to relieve the contractor ? As has been shown, the objections made to the plans or design go to something that preceded the contract and about which the parties in terms did not stipulate. If it could be said to be allowable to consider these as a basis for recovery, it can not be said that what was done four or five years subsequently by the last contractor under his contract to build the sewer around the head of the dry dock when substantially completed can be resorted to as proof of how the original sewer when diverted should have been constructed, nor to prove that there were inherent defects of engineering in the first instance. It is not permissible to imply a warranty of plan and design made before the contract and support it by what transpired between other parties long after the contract and give damages including profits as upon a breach of the contract. The subsequent alteration of the sewer is not evidence that its original construction or location was faulty. Columbia, etc., Co. v. Hawthorn, 144 U. S., 202, 208; Clark case, 96 U. S., 37, 40. In the Ceballos case cited in the opinion the court looked to a former contract between the same parties and to their conduct in giving effect to their subsequent contract. How this can authorize a court in determining the rights of parties under this contract to look to another contract made subsequently with another party is not apparent.
It remains to be said that the plans and specification for the dry dock had no connection with the sewer, and their *204 efficiency was untried by plaintiff. The sewer was not part of the dry-dock design any more than the houses and structures which were also removed from the dry-dock site. It was diverted to clear the dock site, so that the plans and specification for the dry dock could be used. It is quite true that the contractor agreed to divert the sewer, as provided by paragraph 196 of the plans and specification, but his contract was to build and complete the dry dock, and the intercepting sewer mentioned in said paragraph is under the heading of “Temporary Works and Preparation of Site.” He was given six months in which to remove the structures and divert the section of the sewer, and he covenanted to complete the dry dock within 36 months thereafter. If the theory be that the defendants should be made to respond in damages because of “inherent defects in engineering inefficient plans and designs ” to which the loss is ascribed, when there is no stipulation in the contract upon that subject, we would overlook the long-established rules that the Government does not guarantee to any person the fidelity of any of its officers or agents whom it employs, Gibbons case, 8 Wall., 269, that it is not responsible, outside of its contracts, for the misfeasances or wrongs or negligentes or omissions of duty of its officers or agents, Bigby case, 188 U. S., 400, and cases there cited, and that parties entering into contracts with the United States are presumed to do so with a full knowledge of said principle and to consent to be dealt with accordingly. Hart's case, 95 U. S., 316. The record does not show that the sewer was the property of the United States, though furnishing an outlet and constituting a part of the Brooklyn sewer system it passed through Government property. If it was the property of the said city, as it must have been, since it served the city, and if it was allowed by the city to be or remain in a defective or dangerous condition, an action for damages caused thereby would be based upon negligence and sound in tort. Similarly, if it belonged to the defendants, and they owed the duty of keeping it in a proper or safe condition, their liability for a breach of such duty in the absence of contractual obligations to do so would rest upon negligence and sound in tort. The material difference in the two illus *205 trations is that the city could be made to respond for the tort, if liable, while the United States is not suable for torts. Bigby's case, 188 U. S., 400. In the Sundstrum case, 213 N. Y., 106, cited in the majority opinion, it is said that the liability of the State to its contractors for defects in its canal does not go so far as its liability to adjoining owners, and that “ there is certainly no liability to contractors in the absence of negligence.” Nor can a party by calling a wrongful act an implied warranty or guaranty convert it into a contract right. A claimant can not by the device of waiving the tort make a case of implied contract against the Government. Bigby's case, 188 U. S., 407, 409. There is accordingly excluded from the jurisdiction of the Court of Claims those claims or obligations which the law is said to imply from a tort. Harley's case, 198 U. S., 229. Juragua Iron Co. case, 212 U. S., 297, 309. Whether the case is rested upon the supposed inherent defects in engineering and design or a supposed duty on the Government to repair and maintain the sewer (and I do not' agree that there was any such defect or duty) the result must be that the action can not be maintained, no matter by what name the supposed obligation be called. “A right of action in contract can not be created by waiving a tort, and the duty to pay damages for a tort does not imply a promise to pay them upon which assumpist can be maintained.” Cooper v. Cooper, 147 Mass., 373, quoted approvingly in Bigby's case, supra.
If the action is on account of a failure to disclose the existence of said dam in the 7-foot sewer it would, under the foregoing cases, “ sound in tort,” and this court would not have jurisdiction.
The plaintiff sues upon an executory contract. He does not aver or show any impossibility of performance. There is nothing in the findings which shows that the defendants prevented performance or interposed any objection to his resumption of work. Their insistence was that he proceed. The findings show, inferentially at least, the great patience with which the plaintiff was dealt with and his continued refusal to resume. If under the circumstances after delaying for 15 months and the plaintiff’s repeated refusals to resume work except upon conditions stated by him the de *206 fendants were not authorized to annul the contract, the provision in the contract giving that right must be ignored and treated as useless. It is, however, a valid provision. Graham’s case, 231 U. S., 474.
The rule applicable to contracts generally is thus stated in Dermott v. Jones, 2 Wall., 1, which was twice before the Supreme Court and is a leading case on the subject: “It is a well-settled rule of law that if a party, by his contract, charges himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties-, however great, will not excuse him.”
In Dermott v. Jones, the contractor, Jones, contracted with Miss Dermott to build a certain house for her upon her land according to detailed plans and specifications prepared by her architect and made a part of the contract. He covenanted to supply all requisite material for the execution of the work in all its parts and details and for the complete finish and fitting for use and occupation of the building to be erected pursuant to the said plan of the work, and that the work should be executed and finished ready for occupation, and be delivered over “so finished and ready” at a date fixed. The contractor built the house according to the specifications. Owing to latent defect in the soil the foundation sank, the building became badly cracked, and so dangerous to passers-by that the owner, Miss Dermott, was compelled to take it down, renew the foundation, and rebuild that part of the structure which had given way. She did this at large expense, but made a good building. The contractor sued for the price of the original structure, and the owner sought to recoup the amount she had necessarily expended in order to render the cracked part of the house fit for use and occupation acording to the plan and specification. The trial court refused to instruct the jury that said expense was a proper matter of recoupment in said action, and that refusal made the important question in the appellate court.
In the Supreme Court’s opinion it is said:
“The defendant in error [the contractor] insists that all the work he was required to do is set forth in the specifications, and that, having fulfilled his contract in a workman *207 like manner, he is not responsible for defects arising from a cause of which he was ignorant and which he had no agency in producing.”
Referring to the signed instrument and the specifications as forming the contract it is said:
“ In that instrument the defendant in error made a covenant. That covenant it was his duty to fulfill, and he was bound to do whatever was necessary to its performance. Against the hardship of the case he might have guarded by a provision in the contract. Not having done so, it is not in the power of this court to relieve him.”
The court refers to a number of adjudicated cases, and says:
“ The principle which controlled the decision of the cases referred to rests upon a solid foundation of reason and justice. It regards the sanctity of contracts. It requires parties to do what they have agreed to do. If unexpected impediments lie in the way and a loss must ensue, it leaves the loss where the contract places it. If the parties have made no Srovision for a dispensation, the rule of law gives none. It oes not allow a contract fairly made to be annulled, and it does not permit to be interpolated what the parties themselves have not stipulated.”
It was accordingly held that the recoupment could be made.
It is declared in Smoot's case, 15 Wall., 36, that the impossibility which releases a man from his obligation to perform must be real, and not a mere inconvenience.
In The Harriman, 9 Wall., 161,172, the rule is stated to be that if what is agreed to be done is possible and lawful it must be done. Difficulty or improbability of accomplishing the undertaking will not avail the defendant. “ It must be shown that the thing can not by any means be effected. Nothing short of this will excuse performance.” See also Railroad Co. v. Smith, 21 Wall., 255.
These principles were applied in Jacksonville Railway v. Hooper, 160 U. S., 514, 527, where the impossibility relied on arose subsequent to the making of the contract.
In Thorn v. Mayor, 1 L. R. App. Cases, 120, the declaration alleged that defendants guaranteed and warranted to the plaintiff that Blackfriars Bridge could be built accord *208 ing to certain plans and a specification then shown by defendants to plaintiffs, without tide work and in a manner comparatively inexpensive, and that certain caissons shown on the said plans would resist the pressure of water during the construction of the bridge, whereby the plaintiff was induced to contract with defendants for a certain sum of money, far less than he otherwise would have done, and then there was alleged the failure of the plans and specification and of the caissons, whereby he was obliged to expend large sums of money in an effort to build the bridge according to such plans and in afterwards completing it. “ The cause of the failure was that the caissons would not resist the external pressure of the water, so that the piers of the bridge had to he built independently of them and much of the preceding work was wasted, and the piers were built as the tide permitted the work to go on, which occasioned great delay.” The Lord Chancellor stated the question to be “whether there is any, and if any, what, implied warranty on the part of the defendants to the effect stated in the declaration, or so as to give plaintiff a cause of action against defendants.” Speaking of the consequences which would flow from a holding that the furnishing of plans and specification by the owner to a contractor implies a warranty, he says in his opinion: “The proposition which would be affirmed would not go merely to the present case, but would go to nearly every bind of work in which a contractor is employed and in which, for convenience, specifications of the details of the work are issued by the person who desires to employ the contractor. In those specifications and in the contracts founded upon them an elasticity or latitude is always given by provisions for extra additional and expected work; but if it were to be held that there is with regard to the specification itself an implied warranty on the part of the person who invites tenders for the contract, that the work can be done in the way and under the conditions mentioned in the specification, so that he is to be liable in damages if it is found that it can not be so done, the consequences, I say, my Lords, would be most alarming. They would be consequences which would go to every person who, having employed an archi *209 tect to prepare a plan for a house, afterwards enters into a contract to have the house built according to that plan. They would go to every case in which any work was invited to be done according to a specification, however unexpected might be the results from that work when it came actually to be executed.” There was an express contract in the Thorn case, and it was not contended for plaintiff that there was any express warranty of the plan. The Lord Chancellor says the question may readily be asked, Is it natural to suppose that any warranty can have been intended or implied between these parties? He then proceeds with a supposed condition, which may be paraphrased and applied here as follows: Suppose the contractor had gone to the chief of the bureau or other officer and said, You want a dry dock built according to a certain plan and specification. Will the United States warrant that it can be built according to that plan with the diverted sewer where it is located on the plan? “Can any person for a moment entertain any reasonable doubt as to the answer he would have received ? ” It was held that no implied warranty was made, and that damages as for a breach of warranty the plaintiff was in no respect entitled to.
In Bottoms v. Mayor of York, reported in Hudson on Bldg. Contrs., Vol. II, p. 220, it appeared there was a contract to build certain sewers under specifications, with the right reserved to the defendants’ engineers to change the same. The plaintiff agreed that the works should be carried out in all respects with the specifications and drawings and to the satisfaction of the engineer. The contractor commenced his work, and as he proceeded his difficulties increased, because of the condition of the soil. Having appealed to the engineer without avail, he appealed to the city authorities. He claimed the work could not be done according to said plans in that soil, and asked, as claimant here in substance asked, for a modification of his contract. The authorities refused it, as stated in the opinion of the Queen’s Bench Division, from which court the appeal was prosecuted: “The corporation heard, through their committee, his application and refused to grant it,” as was done *210 in the instant case, “ and they came to the resolution to give him notice under the terms of the contract to go on with the work. That notice was accordingly given. The plaintiff refused to go on with the work, and immediately after-wards, on the expiration of the notice, the corporation seized the plant and took the work out of his hands.” All these things were done in the instant case. Bottoms sued to recover for work he had done, and it was held that in the absence of any specific guaranty or definite representation as to the nature of the soil in which the works are to be executed a contractor is not entitled to abandon the contract on discovery of the nature of the soil, nor because the engineer declines to give written orders entitling him to extra payment in consequence of difficulties in executing the work which had not been foreseen by the contractor. It was further held that the corporation was within its rights, after the contractor’s refusal to proceed, in seizing his plant, which they did as authorized by the contract. The conclusions there accord with the conclusions in Dermott v. Jones, supra.
These principles are applicable here. Plaintiff’s undertaking was that he would build and complete the dry dock with the sewer located as it was and built of brick as it was. He suspended work and refused to proceed—he abandoned his contract and has shown no legal or valid excuse for his action.
There is nothing in the Hollerbach case, 238 U. S., 165, or the Christie case, decided lately, that contravenes the position taken in this dissenting opinion. In the former, effect was given to a positive statement in the specifications, and in the latter to a failure to communicate, when applied to, the information in possession of the Government. Neither of them qualify the principle announced in the Simpson case, and neither holds that a contractor can fail, to seek information, when notified he must do so, and then complain that he did not get information which more attentive bidders did get. Both cases admit “the rule that the contract is the law of the case.” Simpson’s case, supra; Atlantic Co. v. Philippine Islands, 219 U. S., 17, 23.
*211 After plaintiff had notified the officer in charge that he would not resume work except upon conditions stated by him 15 months’ time was consumed before the Secretary of the Navy exercised the right reserved in the contract of annulling it. Every reasonable effort was made to induce the plaintiff to proceed with his contract. Finding X shows this. But by his language and conduct he evinced a purpose to stand by the determination formed on the day he notified the department of his intention to suspend and not resume. If, after all the correspondence, discussion, investigations, and report by a board of officers during said period of 15 months the Secretary did not have the right to annul the contract and relet it, it is difficult to see what course he could have pursued consistent with the contract. He rightfully annulled it. Graham case, 231 U. S., 474; Bottoms v. Mayor, supra; Roehm v. Horst, 178 U. S., 1.
If it can be said that the condition which arose was not one that was in contemplation of either party to the contract, Chicago, Milwaukee, etc., R. R. v. Hoyt, 149 U. S., 1, 15, the utmost that the plaintiff can claim is a right to quit work and remove his plant. He can not under such circumstances recover profits. I think, however, that the plaintiff should have judgment for the amount for which his plant was sold and some smaller items, aggregating $7,967.98.