BaeNet, J.,
delivered the opinion of the court:
This suit grows out of the construction of a dry dock in Boston, Mass. On the 14th of March, 1899, the firm of O’Brien & Sheehan, composed of John J. O’Brien and John C. Sheehan, entered into a contract with the United States to construct this dry dock, the same to be completed December 1, 1901. The time for completion was afterwards extended by the Government to August 30, 1903, but the dry dock was not turned over to and accepted by the Government until August 12, 1905. The City Trust, Safe Deposit and Surety Company of Philadelphia was the surety of the contractors on a bond for the faithful performance of the *170 contract, and by agreement with the original contractors took charge of the work July 10, 1902, and carried it-to completion, and during such time was recognized by the Government authorities as the contractor for said work. As stated in the findings, the term “ contractors ” is hereinafter used to apply either to the original contractors or said City Trust, Safe Deposit and Surety Company, or to all of them, as the time may indicate.
By the terms of the contract the dry dock was to have been completed December 1, 1901, but the time for completion was extended by the Government to August 30, 1903, and it was actually completed and turned over to and accepted by the Government August 12, 1905. It is conceded by the Government that the work was well done; therefore that question does not enter into a discussion of the case.
The damages sought to be recovered in this suit arise out of delays in the completion of the dry dock occasioned by the Government, faulty directions as to its construction given by the Government engineer in charge of the work, changes in the plans for the work, and the construction to be given to several provisions of the contract. These damages are made up of several items which will be considered separately.
COEEERDAM.
The first item is a claim for loss on account of breaks in the cofferdam occurring during its construction, occasioned by a defective plan for the same proposed and directed to be followed by the Government engineer in charge of the work. The first article of the. contract (omitting those terms which are manifestly inapplicable to the cofferdam) provided:
“The contractors will * * * at their own risk and expense, furnish and provide * * * temporary structures of every description * * * necessary or requisite in and about the construction of said dry dock * * * subject to the approval of the civil engineer.”
The findings show that the cofferdam in question was a subject of considerable discussion between the claimants’ engineers and Mr. Maxson, the Government engineer in *171 charge of the work, and properly so, as it was to be one of the largest cofferdams ever constructed. Finally, a general plan was suggested by Mr. Maxson and worked out in detail by the claimants’ engineers with his advice and approval, and this was the plan which was subsequently followed in its construction. Reasonable care was taken in such construction as well as in its filling, but, not unlike many human undertakings, mistakes seem to have been made in the plan as well as in the construction, and serious breaks occurred, involving the claimants in considerable loss of time and money; and the first question to be decided is whether this loss is to be charged to the Government.
The Government was largely interested in the performance of the details of this contract from the very beginning of the work. It had agreed that monthly estimates should be made by its engineer in charge as the work advanced, and that 90 per cent of such estimates should be paid to the contractors from month to month. A mere statement of this fact shows that ordinary prudence demanded that the Government should have general supervision of the work as it progressed, and the claimants had agreed to this as above quoted. The findings show that the Government engineer in charge of the work had considerable skill as a civil engineer, but had had but little experience in the construction of cofferdams.
The findings also show that these defects which caused the breaks in the cofferdam were such as the exercise of ordinary care and skill on the part of the Government engineer would have foreseen. In other words, the first two breaks in the cofferdam were chargeable to the fault of the defendants.
The contractors objected to the plan for the cofferdam, as directed to be made by the Government engineer, and followed it only because it was required of them by him to do so. The contractors, however, took no appeal from his decision and made no formal protest against following his directions.
No case arising under a Government contract has been cited to us on either side which is a precedent for the decision of this case. Numerous cases have been cited by *172 the Government attorney where it has been held that the engineer in charge of the work was the appointee of the parties and that his decision was final unless influenced by malice or prejudice or was so grossly erroneous as to imply fraud or bad faith. But most if not all of these cases 'arose under contracts containing the provision that the decision of the Government officer in charge should be final, which is not true in the case before us; and in all of them the matter for decision was so essentially different as to involve a different principle.
In Kihlberg v. United States (97 U. S., 398) it was ascem taining and fixing a route for the transportation of stores; in Gleason v. Unitéd States (175 U. S., 588) it was the exercise of the judgment of the Government engineer as to the advisability of granting an extension of time to the contractors; in Barlow v. United States (184 U. S., 123) it was the decision of the Government engineer as to the quality of stone employed in the construction of a dry dock. In all of the cases so cited it was the exercise of the judgment of the Government engineer in charge as to the material being employed, the construction of the contract as to the manner of doing the work, or, in general, the way in which the work should be when completed, which was involved. In none of them was the question at issue, What is the responsibility of the Government where its engineer in charge actively directs work to be done in a certain manner which proves defective and causes great loss to the contractor and where the exercise of ordinary skill would have foreseen such defects?
In addition to the provision of the contract above quoted the specifications which were made a part of the contract also provided:
“ The works included in the contract will be carried out by the contractor under the inspection and supervision of the civil engineer detailed for the purpose, who will inspect all the materials and workmanship and will have full authority to reject any which, in his opinion, are not in full, accordance with the true spirit, intention, and meaning of the contract, plans, and specifications.”
It is true that the contractors by these provisions of the contract agreed to construct the dry dock “ under the inspec *173 tion and supervision” of tbe Government engineer, and “ subject to bis approval ”; but we do not think that they thereby agreed to suffer any and all losses which might occur to them by reason of his mistakes in directing the manner in which the work should be done. We certainly do not think that they agreed to bear losses which might occur by reason of defects in a plan proposed and directed by him to be used, which the exercise of ordinary care and skill should have foreseen.
It has been held by the Supreme Court in similar cases that the principles which govern inquiries as to the conduct of individuals in respect to their contracts are equally applicable when the Government is a party. {Smith v. United States, 94 U. S., 214; Clark v. United States, 6 Wall., 546; Amoskeag Co. v. United States, 17 Wall., 592.)
In Wyandotte Railway Co. v. King Bridge Co. (100 Fed. Rep., 197, 203) the Circuit Court of Appeals for the Sixth Circuit (Judge Day, now of the Supreme Court, delivering the opinion) decided that, notwithstanding a provision in a contract for the building of a bridge that no extra labor or material should be charged for unless agreed to in writing, the contractor might recover for additional work or material made necessary by an error on the part of the representative of the other party in locating the bridge, for which the contractor was not responsible.
In Chicago v. Duffy (117 Ill. App., 261, 266) the court said:
“ If through and by reason of the errors of the inspectors of defendant the plaintiff was required to do additional and unnecessary work we think the cost and expense of such additional and unnecessary work should fall upon the defendants and not upon the plaintiff, and this conclusion seems to be in accordance with the decisions.” (C. & G. E. R. R. Co. v. Vosburgh, 45 Ill., 311; Sexton v. City, 107 Ill., 323; Guerin v. Rodwell, 37 N. J. Law, 71; Mulholland v. Mayor of New York, 113 N. Y., 631; Wyandotte v. King Bridge Co., 100 Fed. Rep., 203.)
In McConnell v. Corona City Water Co. (149 Cal., 60) the plaintiff had contracted to construct a tunnel acording to the specifications of the defendant’s engineers and did so, *174 although complaining of the inferior quality of materials furnished by the defendant and of the inadequacy of the work which the engineer directed should be done, but without avail. Because of this inferior quality of material and inadequacy of work the tunnel caved in, thereby rendering extra repair work necessary, and the court held the defendant liable for the cost of such extra work.
Numerous cases to the same effect might be cited, and we believe the rule in cases of this character to be that where a contractor constructs a work under a contract which provides that it shall be done under the direction and supervision of an engineer appointed by and under the employ of the owner and loss occurs to such contractor by reason of defects in the plans directed to be followed by such engineer, of a character which ordinary skill would have foreseen, the owner should pay for such loss. Following this rule the loss occasioned by the first two breaks in the cofferdam is allowed to the claimants, including the extra pumping thereby required, as found in item 2.
The claimant has asked the court to find that the plans for a cofferdam proposed in the first instance by the contractors would have been sufficient and ample for the work and that the cost of their construction would have been considerably less than the one directed to be constructed by the Government engineer, and asks for an allowance for this difference.
The court has found that such a cofferdam as was contemplated by the first two plans submitted by the contractors would have been insufficient, for reasons given. Even if such had not been the finding of the court, we do not think we would have been justified in making an allowance upon such a problematical question.
CHANGES IN PLANS.
The next two items are claims for damages on account of changes made by the Government in the plans as specified in the contract. After the claimants had put in their bids in the alternative, based upon two different plans known as plan A and plan B, and it was found that these bids were above the appropriation for the dry dock, some modifications were made in these plans, the bids were reduced, and these modifications were formally stated in a supplemental *175 clause inserted in the specifications before the contract was signed. According to these specifications sheet D was provided to illustrate some of the work, showing that the dock was to be of the dimensions of plan A, which was considerably smaller than plan B. This sheet D was used in the construction of the dock under the direction of Engineer Maxson for about two years, when it was ascertained that sheet D was a mistake, and the claimants were directed to complete the dock of the dimensions of plan B.
We think the findings clearly show that sheet D, showing the dimensions of the dry dock to be according to plan A was not the contract in that regard actually made. On the contrary, the correspondence regarding the change in plans made necessary in order to bring the contract price within the appropriation, as shown in the findings, clearly shows that plan B was the one which was agreed to be followed. We think this finding is clearly established by the evidence. This finding, however, shows that this misdirection by the Government engineer in charge of the work necessitated the excavation of considerable material by hand instead of with the dredge, which otherwise would have been employed, and that this handwork was more expensive. It follows from this conclusion that the plaintiffs are entitled to recover for this additional expense.
The substitution of plan 155 L for general plan 155 D, as found in Finding IV, depends upon the same principle, and needs no additional discussion.
DATUM PLANE.
This item depends upon the construction to be given to that part of the contract relating to the datum plane of the contract. One paragraph of the specifications is as follows :
“Mean high water. — The mean high water referred to herein is assumed to be 5 feet 2 inches below the coping of the granite dry dock.”
Immediately following this in a table entitled “General dimensions ” occurs the following:
“ Draft over sill at mean high water, 80 ft. 0 inch.
“ Depth from coping to floor in body, 39 ft. 2 inches.
“ Depth from coping to mean high water, 5 ft. 2 inches.”
*176 The findings show that mean high water in Boston, as universally understood by engineers, is 4.54 feet below the coping of the dry dock in question; and that if the dock had been constructed according to this datum plane, a draft of 30 feet of water over the sill at mean high water would have been obtained.
The contractors began the excavation for the dock on this theory, but when they had such excavation nearly completed, the Government engineer in charge compelled them to take a point 5 feet 2 inches below the coping of an old dry dock at Boston as the datum plane, which required them to excavate 7-| inches deeper. He insisted and the Government now insists, that that was the proper construction of the provisions of the contract upon that subject above quoted.
Although it must be conceded that there is some indefiniteness in the terms of the contract in regard to this datum plane, we are inclined to think that the construction given to this contract in that regard by the Government engineer in charge is correct. Otherwise the definition of “mean high water” above quoted would have been meaningless. The specifications, in giving the dimensions of the dry dock, say that the depth from the coping to mean high water shall be 5 feet 2 inches; and’ when we turn to the definition of “ mean high water ” to determine the depth of the dock the claimants say that it means that “mean high water” is 5 feet 2 inches below the coping, which is no definition at all and but a senseless repetition of the statement of the dimensions. It is unnecessary to cite authorities to the effect that, if reasonably possible, some meaning must be given to all of the terms of a contract. There had been a granite dry dock at Boston for many years, and we think it reasonable to construe the contract as referring to that dry dock in its definition “ mean high water,” hence this item is disallowed.
DELAT IN INSPECTION OP STONE.
The next item arises out of the delay of the Government in the inspection of the stone being brought to the work by. the contractors. The specifications attached to and made a part of the contract provided:
*177 “ The- Government authorities at the navy yard are to allow the contractor proper space for landing and storing materials to be used in the construction of the dock.
‡ * * & *
“Previous to the commencement of work under the contract the contractor shall submit a fair schedule of prices for materials delivered, materials worked and in place, and for excavation, etc., which shall, upon approval by the Bureau of Yards and Docks, govern during the construction of the dry dock. * * *
“ Payments are to made monthly upon bills duly certified, from which 10 per cent will be reserved, to be paid on the full and final completion of the contract. No payments are to be made except upon materials delivered, materials worked and in place, and work performed, at the rates in the schedule of prices. The prices for materials delivered shall represent as nearly as possible the actual cost of the same to the contractor, delivered on the site.
“ Monthly payments made on the work during its progress shall not be considered or understood to be a final acceptance of the work in question, but any work which is of an inferior quality, in respect of the material employed or the labor upon it, or is unsatisfactory, shall be rejected and replaced with proper material and workmanship by the contractor, notwithstanding payment’ may have been, made upon such work in monthly estimates * *
It is unnecessary to say that these provisions of the contract were of vital importance to the contractors. Aside from providing what was an absolute necessity, a place to store material to be used in the construction of the dock, they gave the contractors partial payments upon the contract as the work advanced; and, what was still more important, gave them timely notice as to whether the material as it arrived was acceptable to the Government. The duty on the part of the Government to make timely inspections of such materials was unquestionably implied, as otherwise the provision for partial payments would have been useless to the contractors.
It was nearly a year and a half after stone began to arrive at the dock before suitable space for its storage was provided, and then the contractors had made space for themselves by leveling and filling the ground about the dock basin. *178 As tbe stone began to- arrive the contractors asked for its inspection, but this was refused on the ground that it was piled too high to allow a proper inspection t.o be made; but lack of space made it necessary to pile the stone in that manner. After proper space for storage was provided in the manner above stated, and in the month of July, 1901, stone began to arrive in large quantities, but more than a month elapsed before inspection began.
August 10, 1901, Civil Engineer Masson was detached from the work, and on August 17, 1901, Civil Engineer Hollyday took his place, and by the 11th of September following had inspected and accepted nearly all of ‘the stone which had arrived.
Aside from the financial embarrassment which would necessarily follow from the failure to receive the partial payments provided in the contract, the chief injury sustained by the contractors was the want of knowledge as to whether the stone which they were supplying would be accepted by the Government. It would have been unwise and jeopardous to finish at the quarries large quantities of stone under such circumstances, and ordinary prudence forbade such a course. Their contract gave the contractors the right to receive timely knowledge upon this subject.
As a result of this violation of the contract on the part of the Government, the contractors were compelled to give up some of the contracts which they had made for the supply of stone for the dock. In the meantime, the price of labor steadily advanced, and by the time inspection of stone began, and the contractors could renew their contracts for stone, they were compelled to do so at much greater cost.
We think the claimants clearly entitled to recover for this increase in the cost of stone caused by the delay of the defendants.
{Kelly v. United States, 31 C. Cls. R., 361; Snare & Triest Co. v. United States, 43 C. Cls. R., 364, 367; Owen v. United States, 44 C. Cls. R., 440.)
ATTACHING BILGE AND KEEL BLOCKS.
This item depends upon the construction to be given to the provision of the contract relating to bilge and keel blocks *179 for the dry dock. The specifications in regard to keel and bilge blocks provided as follows:
“ Keel blocks, bilge blocks, and bilge-block slides are to be of oak. They will be spaced as shown on plans, and properly fitted with racks, keys, pawls, slides, chains, etc., in the best manner. Details of the blocks, slides, and fittings must be submitted to the engineer in charge and receive his approval previous to construction. The metal work will be of composition of an alloy approved by the engineer.”
The specifications further provide:
“Intention. — It is the declared intention and meaning of the contract to obtain a complete and substantial dry dock according to the general plans and specifications, to the entire satisfaction of the Bureau of Yards and Docks * *
Also:
“ All work shown only in part on the drawings or not fully described in the specifications, and all details omitted, all of which are necessary to the complete and perfect construction, shall be considered as covered by the plans and this specification and the contract entered into for the construction of the dock.”
The contractors had agreed to construct a complete dry dock, and it can not be denied that it was necessary to fasten the keel and bilge blocks to its bottom before it would be ready for use or even ready to test. We think a fair construction of the contract required the contractors to do this work, and this item is not allowed.
EXTRA PUMPING.
It appears from the findings that this work ivas made necessary by the default of other contractors who were to supply the machinery for the pump house, and m-er whom the contractors had no control, and against whom they had no redress. The work was done upon the order of the Government officer in charge of the work, and its cost is allowed to the claimants.
MORTAR EOR PUMP HOUSE.
The allowance or disallowance of this item depends upon the construction of parts of the contract fully set forth in Finding IX. We think a fair construction of the contract *180 upon that subject directed the contractors to lay the brick in question in mortar made in the proportion of four parts of lime and one of Portland cement. The contractors seem to have so understood the contract and began the work with lime mortar in the above proportion. They were stopped by the Government engineer in charge and directed today the brick entirely in Portland cement; they appealed to the Secretary of the Navy, but to no avail, and were compelled to tear out the work already done and relay the whole brickwork in question in Portland cement, at a cost of $1,898.38, and that sum is allowed the claimant.
BREAK IN DISCHARGE CTJLVERT.
The findings show that the discharge culvert connecting the dry dock with the pump wéll was required by-the Government officers in charge of the work to be built upon pile foundations, while, the pump well was built upon a natural foundation. After the culvert had been completed and covered up a break occurred, caused by the uneven settlement of the foundations of the pump well and culvert. This appears to have been due to a faulty method of construction directed by the Government, for which the contractors were not responsible. The contractors were required to repair this break at a cost of $1,299.57, and this item is allowed the claimant. - ....
DAMAGE BY DELAY.
This item grows out of the loss occasioned to the contractors by delays caused by the Government independent of the loss on account of the delay in the inspection of stone already considered. By the terms of the tripartite agreement of 'August 30, 1902, in accordance with which the City Trust Company took charge of the work, the time for its completion was extended to August 30, 1903. As the findings show, the work was substantially completed October 1, 1904, was tendered for test February 24, 1905, but was not tested and accepted by the Government till August 12, 1905. This long period of delay was caused by numerous changes in the plans made by the Government as well as some dilatory action on the part of its officers, the history of which is given in Finding XI. ■'
*181 The law is well settled that when a contractor is delayed by the owner in the prosecution of his work he is relieved from the time limit in the contract; or, as it is sometimes expressed, the owner is thereby deemed to have waived it. This rule is so clearly reasonable as to hardly need citation of authority. (Dannat v. Fuller, 120 N. Y., 554; Texas & St. L. Ry. Co. v. Bust, 19 Fed. Rep., 239; Manufacturing Co. v. United, States, 17 Wall., 592; Ittner v. United States, 43 C. Cls., 336.) It follows as a corollary of this rule that in case of such delay the contractor is entitled to a reasonable extension of the time limit named in the contract for performance.
The findings show that after the City Trust Company took charge of the work it was prosecuted with due diligence and, tailing into consideration these delays, was completed within a reasonable time. It follows from this that the claimant is not chargeable with anything on account of delay, as provided for in the contract, but is entitled to recover such damages as were sustained by reason of such delay on the part of the Government.
The last item, which is for retained percentages, depends upon the item of damage for delay just considered, and under the decision of the latter item is necessarily allowed.
Judgment is therefore ordered for the claimant in the sum of $227,436.11.