## BLOEDEL DONOVAN LUMBER MILLS v. UNITED STATES.

No. 46118.

Court of Claims.

Dec. 1, 1947.

MADDEN and LITTLETON, JJ., dissenting.

Tom S. Patterson, of Seattle, Wash., (Patterson & Patterson, of Seattle, Wash., and Abbott & Lant, of Bellingham, Wash., on the brief), for plaintiff.

John B. Miller, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, HOWELL, WHITAKER, MADDEN, and LITTLETON, Judges.

JONES, Chief Justice.

This is a suit for the value of logging equipment and logs owned by plaintiff and destroyed by fire, and for certain expenses in fighting fire resulting from burning slash in the Olympic National Forest.

Plaintiff and defendant entered into two written contracts in the spring of 1940. The contracts provided that plaintiff should cut and remove certain growing timber and pay for same at specified prices. One of the contracts covered an area of about 14 acres and the other about 80 acres.

The sale contracts contained provisions, recited in our finding 6, requiring the plaintiff to burn such of the slash resulting from the cutting of the timber as the forest supervisor might require, at such times and in such manner as the forest officer in charge might specify. They also required plaintiff to furnish its employees to fight fire in the vicinity outside the sale areas, and for this purpose to place such employees at the disposal of the authorized forest officer, but for this plaintiff was to be compensated, if required to fight fire more than a mile from such areas.

The term slash refers to the branches, tops, and other material removed from the trees in the production of logs and the inflammable debris generally resulting from logging operations. The timber in this vicinity contained much resin and the slash when dry was highly inflammable. If left upon the ground, whenever sufficiently dry it constituted a fire hazard.

In order to prevent the origin and spread of fire it was the custom in the vicinity to dispose of slash by burning at times and under conditions in which the fire could be confined to the slash area and kept from spreading to the standing timber or to other areas to which its spread was not desired. This was a sound and reasonable practice. Conversely, it was not good practice or the exercise of reasonable care to burn slash at a time when it could not reasonably be expected that such conditions would prevail during the burning.

Each contract contained the following provision: "The purchaser agrees to burn such of the slash resulting from this sale as the Forest Supervisor may require, at such times and in such manner as the Forest Officer in charge shall specify."

Each contract also contained the following provision: "If required, slash from winter logging shall be burned in the following spring, and slash from summer logging shall be burned in the following fall, and in no instance shall slash burning be postponed except when weather conditions, or other adequate reason, makes slash burning impracticable in the judgment of the Forest Officer, when it may be postponed in writing until conditions are more favorable."

By the latter part of 1941 in addition to the unburned slash in the areas covered by the two contracts, there was unburned slash in other areas in the same general vicinity. Under the direction of Ranger S. M. Floe, in charge of the Snider station, and with the advice and approval of Carroll B. Neal, Forest Supervisor of the Olympic National Forest, separate detailed plans for burning slash in the various areas were formulated and put into writing. One of such plans, dated September 19, 1941, included 76 acres of slash in the areas covered by the two contracts, and approximately 336 acres of unburned slash on privately owned adjacent land which had also been cut over by plaintiff.

The plan set out in considerable detail the requirements for safely executing the

burning operation and contained the following provision:

"Slash on this area is all continuous and the whole unit will be considered as one compartment in the firing plan.

"On account of the present dampness of the slash and the unpredictable weather that we will have before burning, it will not be possible to specify the exact time and intensity of the firing. The judgment of the Forest Officer in charge will dictate the action to be taken and the following general plan will be followed."

Defendant's forest officers intended that the plan be executed as soon as the material dried out sufficiently, but because the material did not dry out it could not be burned during the year 1941.

At all times involved here Sanford M. Floe, Ranger in charge, and George H. Gifford and T. Albert Davies, Assistant Rangers, and V. E. Miller, Assistant Supervisor of the Olympic Natonal Forest, were the authorized representatives of defendant in the field for the administration and enforcement of the provisions of the two contracts.

During the year 1942 Floe, Miller, and Gifford were appointed private Rangers in the Department of Conservation and Development of the State of Washington. The laws of that state provided that State Fire Wardens, under the direction of the State Supervisor of Forestry, should engage in the discovery of inflammable materials and direct or assist in the burning of such materials. There is no evidence, however, that Floe, Miller, and Gifford purported to act or did act under the direction of the State Fire Warden or the Supervisor of Forestry in the burning of the slash covered by the plan referred to. In fact, Miller testified that they did not dispute the fact that they were representatives of the United States in directing the burning of slash under the contracts.

Before drying weather commenced in the spring of 1942 the Washington Forest Defense Council, apparently as a protective war measure, put a ban on the burning of slash in western Washington. In September there were 1,800 to 2,000 acres of unburned slash in the general vicinity of the two contracts which the defendant's forest officers in charge were anxious to get burned. On September 9 the Forest Defense Council or the Army lifted the ban. On September 10 Miller, Assistant Forest Supervisor of the Olympic Forest, drove from Olympia, Washington, via Lake Quinault, to Snider Ranger Station to make arrangements for the burning of slash in the Calawah area and nearby Bear Creek and other areas in the vicinity of the tracts covered by the contracts in question.

The same day that Miller drove from Olympia to Snider Station, Miller and Floe went to Sekiu, Washington, to talk with C. C. Donovan, logging manager for plaintiff, and the superior to plaintiff's logging superintendent, Wood, for the purpose of getting him to agree that the slash should be burned commencing the next day. They took with them the plan which had been prepared in 1941.

Floe and Miller showed the plans to Donovan and asked him to agree to their execution the next day. Donovan agreed upon condition that Floe and Miller talk to Superintendent Wood and that Wood give his approval, since Wood was on the ground and he, Donovan, was not. Wood was in charge of actual logging operations. Miller and Floe went to Sappho, Washington, later the same day and talked with Wood. They asked him to arrange for burning slash at upper Calawah and at Bear Creek the next morning. Wood agreed without protest to the burning at Bear Creek, but objected to the burning in the upper Calawah area on the ground that he did not think it advisable to burn at that time. Floe urged him to agree to the burning at upper Calawah, and Wood, thinking that Donovan had agreed to the burning, did not protest vigorously, but made it clear that he thought it was a bad time to burn in the Calawah area. He agreed to furnish 8 men to commence burning the area at upper Calawah, provided he could first get permission from Donovan directly.

The next morning, September 11, Floe returned to Sappho and found that Wood had provided only the 8-man crew for the Bear Creek operation. No men had been provided for the Calawah area. Wood

had been unable to get in touch with Donovan. The weather conditions appeared unfavorable to him. There had been a lack of rainfall and he considered it not good judgment to burn in the Calawah area at that time, and for that reason he did not want to assume the responsibility of burning at Calawah without orders from Donovan.

Floe was highly indignant at what he asserted was a breach of the agreement made the night before, and his expressions became heated. In the course of the discussion Wood argued that under the conditions spot fires were likely to occur. Finally Floe announced that he was returning to the ranger station and that so far as he was concerned slash burning that year would not be carried out. He walked toward his car and, prompted by Floe's declaration and his action, and desiring to avoid responsibility for blocking the plan to burn, Wood acquiesced.

The crew which had been assembled for the burning at Bear Creek was divided and half of it went with Assistant Ranger Gifford to set fires in the upper Calawah area, where they met Assistant Supervisor Miller. The fires set that day in the upper Calawah eventually resulted in the conflagration which caused the losses which form the basis of this suit.

After a long period of little rain, in order to burn slash without undue hazard to surrounding areas, the generally accepted practice among reasonably prudent operators in the logging industry in the general vicinity of the areas here involved is to wait for a wetting rain of one or more inches at one time covering a period of one or two days, so as to thoroughly wet the green timber and the ground cover. After such a wetting the slash dries more rapidly than the green timber and there is a short period during which the slash is dry enough to burn readily but the green timber is wet enough to resist burning.

When this condition exists the fire should be set at the first prediction of rain by the United States Weather Bureau. If this is done the slash will be burned out in a short time and the ensuing rain will put out the smoldering logs, stumps and other lingering fires, the continued burning of which would otherwise be a hazard.

After a long period of little rain such as was experienced in the areas here involved prior to September 11, 1942, the date the fire was set, a slash fire would continue to burn until put out by rain. It would spread, but in the absence of wind the spreading could be controlled by digging trenches down to the mineral soil so as to prevent the fire from creeping over the ground through the organic covering, and by patrolling the ditch and putting out such small fires as would be started from the opposite side from sparks or embers which would occasionally get across the ditch. If a wind reached 12 to 15 miles an hour the spread of fire could not be controlled effectively by the digging of ditches. Winds of 15 miles or more an hour would carry sparks and embers for considerable distances and set fire to new territory. Fires so started are referred to as spot fires. Under a strong wind the slash and other fires in some instances would become so hot that men could not work near them to extinguish or control them.

There had been very little rain during the months of August and September 1942 and no wetting rains of the character above described had fallen for many weeks prior to the day the fires were set. Fogs and mists had provided some moisture.

On September 11 the first fire was set by Miller some time between 12:00 and 1:00 o'clock p. m. As outlined in the burning plan fires were then set along the edge of the green timber to the ridge on the west. The fires burned in the slash that day and did not run into the green timber in any material respect.

The fire set at Calawah spread during the next ten days. During this period plaintiff's men continued to fight to keep it under control. From September 17 to September 20 practically all of plaintiff's logging crews and firefighting equipment were engaged in fighting the fire and controlling its further spread. The fire was checked and brought under control on September 20 by men working with pumps and building hand trenches, and with machinery building such fire lines as could be built

with power machinery. Representatives of both parties apparently felt at that time that the situation was "in pretty good shape".

On September 21 plaintiff's logging crews were put back to their logging work in a nearby area. About 11:00 or 12:00 o'clock on the same morning all logging operations closed down because the relative humidity had dropped dangerously and the wind had started to blow. It is not apparent that anything more could have been done had the entire logging crew remained at the scene of the fire all the time. They were logging only a few hours and returned to the fire immediately at the first danger signals. They were all back fighting fire several hours before it began to spread seriously. The three or four hours' intermission after three days of desperate fighting could not possibly be construed as an intervening self-sufficient cause, such as would break the original causal connection, and without which the damage would not have occurred. The result would have been the same regardless of whether they all remained at the fire during the morning hours. If there had been any fault in permitting most of the logging crew to go back to logging temporarily, the blame would probably fall more heavily on the Ranger in charge since he had authority to direct that plaintiff keep all or any part of his men at the scene of the fire. But there was no fault on either side at this point, since during the brief period everyone felt the situation was well in hand. Whatever fault there was lay in starting the fires in the first place, and that was the real cause of the damage.

In the afternoon a strong dry wind from the east and northeast whipped the fire west and southwesterly toward the area where plaintiff's logging equipment was located. By evening spot fires developed from sparks and burning embers blown about a mile across the intervening unburned area. They spread rapidly over the hill and down the opposite side to the south where the fire damaged or destroyed a large amount of plaintiff's equipment and cut timber. All plaintiff's available forces remained continuously in action and succeeded in controlling the fire within two or three days.

Quenching rains started to fall September 30 and put out the fire.

No issue is made as to the value of the machinery that was destroyed. There is some issue as to the value of the logs and also as to the expenses incurred in fighting the fire. The major question is whether plaintiff is entitled to recover in this court by virtue of the facts in this case growing out of the contracts with the Government. We think it is.

■■ The contracts expressly provided that plaintiff burn slash "at such times and in such manner" as the forest officer in charge should specify. This implied an obligation on the part of defendant to use due care in specifying a time when the slash must be burned. If defendant's forest officer failed to exercise due care in specifying a time to burn, and if, as a result, the burning damaged plaintiff's property, defendant would be liable for such damage as might reasonably have been foreseen as the natural probable consequence of his action. This action being connected with and growing out of a contract is within the jurisdiction of this court. Dooley v. United States, 182 U.S. 222, 228, 21 S.Ct. 762, 45 L.Ed. 1074; United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166; Moore v. United States, 46 Ct.Cl. 139, 173; Chippewa Indians v. United States, 91 Ct.Cl. 97, 130, 131; Deterding v. United States, 69 F.Supp. 214, 107 Ct.Cl. 656, 661; Heil v. United States, D.C., 273 F. 729, 731.

The danger of a forest fire is an ever-present one in the great forests of this country, especially in the dry season. Once a fire is started, control is so difficult and the probability of widespread destruction of property so great, that extreme caution is required not only in setting fires, but also in preventing an accidental setting. Warning signs are placed all over the national forests. The danger is universally recognized. In fact, that is one of the chief reasons for having a Forest Ranger Service and one of its primary responsibilities. It is no ordinary responsibility, which no doubt is one of the reasons that the contract gave that agency complete charge of the time, place, and manner of burning slash, as well as complete supervision of such burning.

The evidence shows that it is well recognized among logging people that it is not safe to start fires in an area unless there is likelihood of rain within 36 hours.

The evidence further shows that paintiff's logging superintendent believed that the weather conditions were not favorable. It also justifies the finding that for all practical purposes the Government did require and compel the plaintiff to burn the slash after such superintendent had made known his objections and his reasons therefor.

With such unfavorable conditions there was danger of a fire getting out of control and with adverse weather conditions an uncontrolled fire might spread for miles. In such a situation burning embers and sparks would be carried through the air for considerable distances and might cause new fires to start. This was common knowledge among people familiar with forests and forest fires in the northwest.

Ranger Floe and Assistant Supervisor Miller undertook to justify their decision to cause the slash to be burned on September 11 by testimony to the effect that they had reasonable ground for believing that adequate rainfall was then imminent. Ranger Floe had had 15 years' experience at Snider Ranger Station. On the basis of his experience, as he recalled it, he assumed that normally fall rains started about September 10, and that he could expect rains daily. He knew that in some years the fall rains did not commence as early as September 10, but thought he had to form his judgment upon an average for the commencement of the rains. He relied on his recollection and did not examine the records of precipitation.

The long-time records of the United States Weather Bureau for western Washington show that 76 percent of the average yearly precipitation occurs during the six months beginning October 1 and ending March 1, and that there is no definite time for the beginning or ending of the so-called dry and rainy seasons, the transitions being gradual and variable.

Defendant contends that, regardless of defendant's responsibility, plaintiff waived any right under the implied obligation by consenting to the burning. But whatever might have been the effect of free and voluntary participation, that is not this case. Plaintiff's logging superintendent did not freely and voluntarily agree to the burning. He protested that the weather was unfavorable; he insisted that he would not assume the responsibility for consenting to a fire without the approval of his superior. He persisted in his protests until Ranger Floe, after a heated and angry discussion, walked to his car and threatened that no slash would be burned that year.

This conduct of Floe was not entirely purposeless. He was not a petulant child, but was an intelligent man in a responsible position. The proposed slash burning was highly important to him and his superiors and he was not likely to abandon his project to gratify his temper. He wanted to put a fear of consequences into the mind of plaintiff's superintendent, and he accomplished that purpose.

Floe's conduct and declaration placed Wood in a dilemma. If Floe carried out that threat—and his action in striding to his car was sufficient to convince a reasonable man that he intended to do so—plaintiff could be charged with a breach of contract and be subjected to whatever normal incidences of damage might accrue from such a breach. There was the added possibility that, before the next year, some unforeseeable fire in the slash might destroy greater amounts of Government timber and plaintiff would be accused of being solely responsible.

By a carefully worded declaration, made and perhaps recorded at that time, plaintiff's superintendent could have made it entirely clear that he agreed to burn against his best judgment and against his wishes and because of such compulsion. He could have made it clear, as experienced building contractors generally do, that he was proceeding under protest and was saving all plaintiff's rights under the contract. Presumably, if that had been done, no question of waiver would have been raised. But he was a logger and had no legal adviser at his elbow. His decision had to be made instantly, for Floe was about to climb into his car and drive away. He had made his protest, and it seems

abundantly clear from the situation itself that he acquiesced, as he testified, only because he did not want the responsibility for blocking Floe's plan to burn. In our opinion this is not the free and voluntary acquiescence which, in the eyes of the law, constitutes a waiver.

 It is not certain that plaintiff would have waived its right to recover even if the logging superintendent had made no objection. When to burn and when not to burn is a question upon which inherently there might be considerable disagreement between the Government and the logging company. When the contract was entered into, the Government wanted to leave no question as to whose opinion should control. The contract, therefore, deprived plaintiff of any discretion in selecting the time for burning. It placed that discretion solely in the forest officer. The contract gave plaintiff no right to refuse to burn when the forest officer told it to burn. Since, under the contract, the plaintiff had no right to refuse to burn when directed by the forest officer, no complaint should be heard that it did not insist that it had such a right.

The evidence is clear that the basis of Wood's protest against setting fires in the Calawah area was that he thought the weather conditions unfavorable to burning, that it was too dry and therefore dangerous. It is true that Floe testified that Wood also assigned as an additional reason that he preferred not to divert men from his logging crews as he did not want the mill at Bellingham to shut down. There is thus a conflict in the testimony, but whether or not the second reason was given, we are convinced from the evidence that the emphasis was placed on the adverse weather conditions, that that was the controlling reason for Wood's objection, and that while it was naturally desired to keep the mill in operation, that position, if taken, was incidental.

That weather conditions were actually unfavorable is established by the fact that a weather report in the hands of Floe, dated September 10, showed rising temperature, lower humidity and wind shifting from west toward the north. This in itself should have been a warning to Floe who had the full responsibility for determining when the fire should be started. When this is laid alongside the fact that Wood, who was experienced and was on the ground, thought weather conditions unfavorable it constitutes a double warning.

At 10:45 a. m., September 11, about two hours before the first fires were set, the Fire Weather Service telegraphed the Forest Supervisor at Olympia a special weather forecast as follows: "Clear to scattered clouds rising temperature lower humidity fuel moisture light to gentle easterly winds moderate tonight."

The east wind constituted an additional warning against starting a slash fire because east winds in that vicinity came over the land instead of from the ocean and indicated drier and warmer weather and consequently dangerous conditions.

Telephone communications were available. The message could have been phoned by the Supervisor in accordance with the usual practice, or, in view of the previous warning, Floe could have phoned for the latest reports. Neither was done. Floe did not receive the message until the morning of September 12 after the fires had been set about 1:00 p. m. September 11.

Floe who had full responsibility should have delayed in the face of these warnings of danger. No doubt he would have done so had he not been out of humor following a heated argument.

Even after receipt of the last telegram he could have ordered that no further fires be started, and the ones already set might possibly have been controlled. Instead he permitted his assistants to order additional fires notwithstanding the very adverse report of weather conditions which he had actually received the morning of September 12.

With Floe holding complete power under the contract to determine the time and manner of burning slash, action should have been taken only after careful consideration of the vast properties at stake. No heat or stubbornness or personal whim should have been permitted to enter the mind or affect the decisions of the man who had the responsibility for making them.

Naturally the defendant could not be held liable for ordinary mistakes or errors of judgment. These are inevitable. But viewing all the evidence and circumstances we cannot escape the conclusion that the action of Floe was either arbitrary or negligent and that defendant is responsible for the damages that reasonably could have been foreseen as the natural and probable result of the action taken.

During the period from July 17 to September 10, prior to the setting of the fires, there had been no rain except 0.02 of an inch on August 21, 0.12 of an inch on August 25, 0.01 of an inch on August 28, 0.01 of an inch on September 5 and 0.19 of an inch on September 6, only a little more than one-third of an inch of rain for the entire period. The proof is conclusive that in these circumstances it was dangerous to set fires and undertake to burn slash. An experienced man should have foreseen that anything might happen if a fire were started in a great forest under these conditions.

The outstanding experts in this field in the Pacific Northwest testified uniformly that it was unwise and dangerous to set fires during such period. These witnesses included Norman G. Jacobson, Major Charles S. Cowan, Dr. Gordon D. Markworth, Dr. John Kenneth Pierce and L. T. Webster. All were university graduates and two of them graduates of the Forestry School of the University of Washington. Each of them had had extensive experience in forest management and in the problem of fire control, which is a major problem in the forests of the Pacific Northwest. Practically all of them testified that it was desirable that there be a rain of from one and one-half to two inches within two days prior to the setting of the fire and also rain predicted for within two or three days following the setting of such fire.

Norman G. Jacobson was consultant forester for the St. Paul and Tacoma Lumber Company, one of the large operators in that section. He was a graduate of the University of Minnesota in forestry and had had ten years' experience in the United States Forest Service. He had been supervisor at the Deschutes National Forest at Bend, Oregon, and had done special work on slash disposal for a number of companies in Oregon, Washington, Idaho, and California. He testified that he did not figure it was safe to burn until there had been at least one inch of rainfall at one time over a period of one or two days, and he preferred to wait until there was at least two inches before starting the fire. After having his attention called to the weather reports for the period mentioned he testified: "I would say that with the weather conditions as reported, the burning was done at a very dangerous time."

He further testified:

"It is a red flag to a forester when you say "east wind;" we know what that means. That means low humidity and very dangerous wind. The fire would continue to burn, and the country, the timber and the second growth * * * would present a very high hazard for a fire.

"If you had a heavy rain to start with you would not have a hazard or any danger to the green timber on the ground that you don't want to burn, because you would have had enough second growth in it to shade the ground."

He testified the humidity as reported was too low to make slash burning safe; that under the conditions as described to him—which followed closely the record facts from the Weather Bureau— it wouldn't be practical to put out a fire once it was started. As to the slash burning policy of his own company he testified as follows:

"We would not burn until we had a good, soaking rain, at least two inches. Under some conditions we might burn with a little bit less, if it was a heavy, continuous rain and soaked down the territory, and we would set the fire when the slash that we wanted to burn was considerably drier than the debris underneath the timber and the old, logged-off land.

"59. Q. You would wait then in the fall until you had had one good wetting rain? A. That is right.

"60. Q. And then when that occurs, is it your policy to burn the slash? A. When the weather reports indicate we are going to have rainy weather again, and that area is dry enough so we can make it burn.

"61. Q. How long has that been the practice of your company? A. Well, it has been the practice of the timber industry for a great many years; not only our company, but most every logging superintendent knows that.

"62. Q. Let me ask you this question: Is it, or is it not, the general practice of a reasonably careful and prudent operator in the logging and lumber industry, in western Washington, to do that? A. That is right.

"63. Q. Now, assuming the weather conditions were as we outlined them heretofore, and under conditions as disclosed by the testimony, which you have testified, as I understand, that you have heard, would it, in your opinion, have been in conformity with the practice of reasonably skillful and careful operators in the industry, to have started a slash fire of the size indicated here, on the date mentioned? A. No; it would not."

The other four witnesses named, all of whom were trained and experienced men, testified along similar lines. Each of them had had from ten to thirty-four years' practical experience in the timbered sections of the Pacific Northwest. They were disinterested witnesses. Their testimony is simply overwhelming, and is not contradicted by a single disinterested witness.

The defendant saw fit in preparing the provisions of the contract to give the Ranger Service complete control of the time, place and manner of burning slash as well as entire supervision of the actual burning. This is made abundantly clear in section 16 of the contract. The plaintiff was given no discretion in the matter. The defendant in the light of these provisions must bear the responsibility.

It was a bad time to burn slash. In refusing to heed the warning signals as to weather conditions which were growing steadily more adverse, the Ranger in charge was negligent, if not actually arbitrary, in disregarding the natural consequences of such action. A reasonably prudent man, situated and circumstanced as he was, could have foreseen the result as the natural and probable consequence of his action in requiring the fires to be set.

The responsibility of the defendant in a case of this kind seems clearly established. Moore v. United States, supra.

■ The loss and depreciation in the value of plaintiff's machinery was $55,290.80.

The plaintiff claims the value of the logs at the point of destruction to be $21,034.33. The defendant claims that certain items of direct and indirect costs as set out in finding 30 should be deducted. We have deducted these items and are allowing the value of the logs as $15,079.53.

In fighting the Calawah fire plaintiff incurred expenses for labor, supervision, medical aid, industrial insurance and Social Security, and for equipment rental in connection therewith, in the sum of $14,583.94. The proof is clear that this amount was spent in fighting the fire. However, paragraph 16 of the contract stipulates that the purchaser agrees to furnish not exceeding 30 men without cost to the Government for the purpose of burning slash covered by the contract. Paragraph 17 requires that plaintiff shall endeavor to prevent and suppress forest fires on the sale area and in its vicinity and shall place his employees at the disposal of any authorized forest officer with the understanding that unless the fire-fighting services are rendered on the sale area or within one mile of its boundaries payment shall be made for such services at rates to be determined by the forest officer in charge.

The proof is not sufficient to enable us to determine what portion of the labor expense was incurred on the sale areas or within a mile therefrom, nor to afford a basis for a judgment apportioning such expense. The only part of this expense which we can allow in the circumstances is the item of equipment rental in the sum of $428.13. The contract did not require plaintiff to furnish this equipment without expense to the Government.

The plaintiff is entitled to recover the sum of $70,798.46. It is so ordered.

HOWELL and WHITAKER, Judges, concur.

MADDEN, Judge (dissenting).

I think the court's decision is wrong for two reasons. The first is that the setting of the fire which caused the damage to the plaintiff's property was a joint venture and not the act of the Government alone. By its contract the plaintiff agreed to burn such of the slash as the Forest Supervisor might require at such times and in such manner as the Forest Officer in charge should specify. This provision of the contract did not put the Government in the position of an insurer that the plaintiff would not, in carrying out its contract, burn some of its own property. The court holds that it was implied in the contract as a whole that the Government would not imprudently require the burning of the slash at a time when the burning would be dangerous, and that this implied condition of the contract was breached. I think that the answer to this contention is that the Government did not require or compel the setting of the fire which caused the damage.

The burning was done pursuant to a plan, made the previous year by agreement of the plaintiff and the Government men, for the burning of slash on 76 acres of Government land and 337 acres of private land which had been cut over by the plaintiff. As to three fourths of the area agreed to be burned, the plaintiff knew that the Government men, as such, had no authority whatever, either under the contract or otherwise. And it was pursuant to this agreed plan that the burning took place which caused the damage. The plaintiff, if it had been seriously unwilling to set the fire at the time and place it was set, would have had only to say to the Government men that the plaintiff's agreement in the cutting contract to burn slash did not apply to most of the area proposed to be burned, and that the Government men were acting as intermeddlers, or in some capacity having no relation to the Government or the cutting contract, in their allegedly imprudent suggestion that the fire be set when it was set. A plan for the burning of the 76 acres of Government land alone would have been quite a different one, and might well have had entirely different consequences.

Apart from the question of lack of authority on the part of the agents of the Government, the evidence does not, in my opinion, come anywhere near showing such compulsion as would entitle one who set a fire to shift its harmful consequences to another. Donovan, the plaintiff's logging manager agreed to the burning, if it was agreeable to Wood, the plaintiff's logging superintendent, who was inferior in authority to Donovan. Donovan's qualification of his agreement was natural, since Wood was the one who would have to interrupt his production schedule and divert the men to look after the fire. Donovan was in the same area as Wood, and knew as much about what the weather was and had been as Wood did. Wood objected to the burning at Calawah, but not to that at Bear Creek, where the climatic conditions were the same. This fact supports the testimony of the Government witnesses that Wood's objection was based upon the diversion of men from production, as well as dry weather. Wood wanted to telephone to Donovan to consult him about Calawah, but, though Donovan was only a short distance away, Wood did not, for reasons which he did not explain, do so. In the morning when the Government men came, Wood had no crew for the Calawah burning and there was a controversy. The Government men started to walk away, one of them saying that he was washing his hands of the burning for that season. Then Wood recalled him and furnished a partial crew and the fire was set. It would have been easy for Wood to have kept the fires from being set by merely doing nothing when the Government men were about to abandon the project. He was not coerced or directed to set the fires, and the plaintiff's attempt to shift their unfortunate loss to the Government seems to me to have no basis in the contract. It was natural that the initiative for the burning should have come from the Government men. The plaintiff had cut the logs from the tract and marketed them. The cleaning up of the tract by the burning of the slash was a burdensome, unprofitable chore which the plaintiff had escaped in the previous year because of the wet weather. Since, then, the Government had to take the initiative to get the slash burned, if the

plaintiff could put all the risks of the burning on the Government just by hanging back and expressing an unwillingness to burn, it could convert a sensible, rational contract into one which the Government could hardly afford to make. I think therefore that the burning, whether it was prudent or imprudent, was the act of both the plaintiff and the Government, and that the Government should not have to pay the plaintiff's losses.

My second ground for thinking the court's decision erroneous is that the damages sued for were not foreseeable consequences of the setting of the fires even assuming that their setting involved a breach of contract by the Government. The fire was set on September 11. It had burned continuously from that date until September 20, had crossed a wide area not intended to be burned, was some three miles nearer than had been intended to the plaintiff's logs and machinery whose destruction is here sued for, but still had a mile wide stretch of green timber between it and the plaintiff's logs and machinery. At that point it was thought by all parties to be under control. No rain had fallen in the intervening ten days.

On September 21, the plaintiff's logging crews were put back to work cutting and piling logs at the place where the damage sued for ultimately took place. The plaintiff is, in effect, urging that it was foreseeable on September 11, when the fires were set, that they might damage the plaintiff's piled logs and machinery. But the undisputed facts show that ten days later, with no rain in the meantime, after the fire had burned across several miles of intervening area not intended to be burned, the plaintiff still did not foresee any such consequence. If it had foreseen it, either on September 11th, or on any later day including September 21 when its property was destroyed, it would not have started on the morning of September 21 to cut and pile more logs for probable or even possible destruction. It would instead have been engaged in removing its machinery and logs from the area of danger.

The plaintiff's case, then, is based upon hindsight, upon the testimony of experts who, looking at the ashes of the plaintiff's property are able to tell us that it was imprudent to set a fire many miles away, many days earlier. If it was imprudent, in the sense of endangering the plaintiff's property, the plaintiff's experienced woodsmen did not know it, any more than the Government's experienced forest officers knew it. For the plaintiff to argue that, on September 11, the harm was foreseeable, which the plaintiff's men did not, on September 21, foresee, seems to me to be absurd. I think the plaintiff's petition should be dismissed.

Judge LITTLETON has authorized me to say that he agrees with the views which I have expressed.